Thank you, Your Honor. May it please the Court, my name is Paul Zinlicke. I'm appearing on behalf of the North American Meat Institute. I'd like to reserve three minutes of my time for rebuttal. The Constitution ensures a national market where farmers and manufacturers are encouraged to produce goods by the certainty that they will have free access for them in every state. The sales ban in Proposition 12 violates the Constitution by closing off the California market to imports of wholesome veal and pork unless out-of-state farmers and producers reconstruct their barns and their operations outside of California to satisfy animal confinement standards dictated by California. Absent an injunction, the sales ban will devastate thousands of pork and veal farmers and impose substantial burdens on the processing and distribution of pork and veal across the country. Could I ask a threshold question? It's almost procedural, which I was confused about. There was a lot of discussion in the briefs regarding regulations that had not been yet promulgated by a California agency, but I couldn't figure out what the relevance of the regulations were. There was nothing in the statute that said that the regulations affected the effective date. They only related to enforcement, the manner in which it would be enforced. Can you help me explain what the relevance of the regulations are? Yes, Your Honor. I think in two respects. One, I think the district court said there was a question about the effective date of the so-called turnaround standard as applied to out-of-state farmers. In-state farmers were given six years to come into compliance with the turnaround standard. Out-of-state farmers, it doesn't say. The statute just says that, as I read it, this is the law. You can't sell unless your operations comply with California requirements. You can't sell in California. I didn't see anything saying that there was a delayed effective date or anything like that. Is there some sort of delayed effective date, and if so, where would that be found? There's nothing in the text of the statute, and that distinguishes Proposition 12 from Proposition 2, which did, on the face of the statute, give in-staters six years to come into compliance. So there's nothing in the statute. There was debate back and forth whether or not the turnaround standard was immediately in effect, and the district court addresses that in her opinion and says that it's silent as to that question. Presumably, the regulations would address that one way or the other. The other way that the regulations would be relevant is that some portions of the statute are subject to exceptions and further analysis. So near the end of the Proposition 12, there's a section for exceptions for veterinary care and things like that, and those might be relevant to whether or not certain veterinary care, or in this case, for the breeding sows, with regard to the period in which they're being inseminated, whether that would be under the statute or whether that would be under veterinary care. Go ahead. I'm wondering, does NAMI agree that Proposition 12 applies even-handedly to all regulated products sold in-state, regardless of the origin of the product? And if not, why not? Setting aside the question about the turnaround standard and setting aside the question about what regulations might come in, we think that it's discriminatory, and it's discriminatory because what it does is it takes away an advantage that out-of-staters have over in-staters. In-staters are obligated under Section 3A of Proposition 12 to set... It takes away an advantage, but how are you differently regulated than in-state people? That's what I asked you. Oh, I think with regard to the obligation for confinement, it would be the same obligation. It would be a leveling effect, and that's our discrimination argument with regard to the fact that it imposes a leveling effect. In the same way that in Baldwin... Let me just follow up on Judge Callahan's question. So if we separate the effects of the statute, the sales ban, so there's a ban on sale of products that aren't farmed the same in a specified way. And that sales ban affects California farmers the same way as out-of-state farmers in the sense of both groups of farmers are banned from sales unless their product was raised the same way. Isn't that correct? That's correct, Your Honor. So the difference is... But also the operational standard that's imposed on California farmers as a matter of law under Prop 2 is not imposed as a matter of law on out-of-state farmers because their states don't require it. Isn't that correct? That's correct, but if they want to sell... Yeah, so that's where the unevenness or the protectivist measures come in, right? That the California farmers are compelled to meet a certain standard, the out-of-state farmers are not. But in order to even level the playing field, if I understand your argument correctly, in order to level the playing field, the California law now requires out-of-state farmers to meet California's operational standards. That's exactly right, and that's exactly what... That was exactly the circumstance in Baldwin in which New York had passed a statute saying, if you want to import milk into New York, you have to pay your farmers the minimum charge that we also required New York farmers to pay. So there was the same treatment, but what it did was it neutralized advantages that were associated with the origin. The out-of-staters are not subject to the confinement ban under Section 3A. They have their own regulations, and so as a result... How do you... I'm sorry, Judge Bencivengo, go ahead. I mean, the voters in California in 2018 passed this regulation, this proposition, saying that they wanted the meat that they were going to buy to consume in California to not have the animals who were going to be subject to that ultimate consumption to be held in a cruel manner. And so they made it uniform. Anybody who sells meat, this kind of meat in California, has to confine the animals in a way that the voters of the state deemed was not cruel. Why is that not a legitimate reason, and how is that protectionist? Everybody who sells meat here has to comply to the same standards. Well, it's not legitimate because what it does is it's inconsistent with the national market that the Commerce Clause guarantees. You're saying it's not legitimate because you don't want to do it, but the Supreme Court has said that it's a legitimate reason for people to be concerned about animal cruelty, and at least one of the reasons that Californians voted for Prop 12 was they didn't like the idea of animals being contained in a cruel manner before they were subject to becoming consumed. So let me, I'm sorry. Remembering again that this is an abuse of discretion standard in the denial of an injunction, how did the district judge abuse her discretion by not accepting that that was the rationale for the proposition, that it was being equally applied to all parties selling meat in California, and it was facially non-discriminatory, and it wasn't protectionist? So, Your Honor, the state of California certainly can dictate animal welfare standards for animals in California in the same way that the state of California can dictate what the employment standards are, what the minimum wages for employees in California. What they can't do, and what the Supreme Court has said they can't do, is they can't dictate the standards outside of its borders, and in the cases that we've identified for that, Baldwin is one of those cases. What Baldwin says is one state cannot restrict imports in an effort to control conduct outside of the state. Now, California can regulate the treatment of animals within the state, but it's not able to, it's not, doesn't have the authority to regulate how animals are confined outside of its borders. In the same way that California can't say, look, if you want to sell products in California, every product has to be produced by somebody who's making the California minimum wage. Otherwise, it would be cruel. California can't do that, and the reason they can't do that, one, is it takes the advantage away from the out-of-staters who are not subject to those standards when they produce their own products. So, is the state's justification, I have a question, was it, there was something about disease and that sort of thing, but then is the state's justification the disease, or is it the humane treatment of animals, or is it both? I think for this proceeding, it's the humane treatment of animals. With regard to disease, you look to defendant's brief 34, note 7, and intervener's brief, page 13, note 4. They say you don't have to look at the food safety issues here, and so that's not something they argued before the district court, and it's not something that's before here. We presented evidence before the district court that there isn't an animal safety issue here, and that's set forth in the declaration of Dr. Belk. But for purposes of this proceeding, it's just they have not raised that issue, so it's not part of the case. They haven't, you know, really our position is if they had not, they cannot create a trade barrier as to wholesome pork and veal, which is what we're trying to do. We're trying to sell wholesome pork and veal. What they're saying is you have to reconfigure all your operations to meet the dictates that California applies to its own farmers. So how do you distinguish, I think, what is it, Harris versus Elever, or whatever, is that the Folk Rock case, or how do you distinguish that? So it depends on the different ground, but so for purposes of discrimination, the only issue that was decided in the Harris case, I'll call it, was facial discrimination. And the case didn't present a discriminatory effect case, which is what we have here, because the only Folk Rock producer in California no longer existed when it was on appeal. With regard to extraterritoriality, the basis that the Harris case advanced was that the standard in Healy only applied to price limitations and price affirmation. The California, I'm sorry, the Ninth Circuit has since then rejected that. In Sam Francis Christie's, the court applied the extraterritoriality doctrine from Healy outside of those. I'm familiar with that case. I was on that. So you're slightly under three minutes. Unless my colleagues want to ask additional questions, you might want to save the balance for rebuttal. Is that what you wanted to do? Yes, Your Honor. Judge Acuda or Judge Benchavango, would you like, it doesn't go into three minutes. If you had questions you wanted to ask right now. No, I'm fine. Okay, so then we'll hear from Mr. Weiss, I believe. All right. Thank you. Go ahead. Good afternoon. May it please the court. Matthew Weiss, Deputy Attorney General for the State Defendants. I'd like to reserve five minutes for Interveners Counsel, Bruce Wagman. Okay. Over the last decade, this court, following the Supreme Court's decision in Pharmaceutical Research v. Wolf, has repeatedly held that the uniform regulation of in-state sales is constitutional, even if such regulation has upstream effects. This circuit's cases, rejecting Dormant Commerce Clause challenges to laws regulating foie gras, shark finning, and fuel standards, have, as this court recently put it in Rocky Mountain II, established a well-worn path precedent. Let me just ask you a procedural question here, since it really kind of turns on the Dormant Commerce Clause here, and it's a legal issue. And I'm just saying this hypothetically, because we haven't conferenced on this, and I don't know what the court's going to do. But if we were to find that NAMI's complaint raises serious questions, can we grant NAMI an injunction, or must we remand it to remand the issue of injunctive relief to the district court? This court would need to remand it to the district court to look at the remaining injunction factors. And I would just point out, since we're on those remaining injunction factors, that the irreparable harm component of the injunction factors is certainly at issue. It's been contested by the expert that submitted a declaration. The district court seemed to indicate that there was evidence of irreparable harm for NAMI, if I recall the opinion correctly. The district court indicated that there was potentially evidence of harm, but that it was not an issue that the district court was ready to resolve at that point. Because it was deciding on no likelihood of success. Mr. Weiss, could you address—I have two questions, but I'll start. I'll get them to you one at a time instead of both of them together. How would you articulate what is the legitimate in-state effect of Prop 12? Two points on that, because that was raised in the context of the extraterritoriality claim, mostly from the brief that the Mead Institute submitted. First, the analysis of local interests is most pertinent to the second prong of the pike balancing test. It's a prong that does not apply unless the Mead Institute—and they haven't shown it here— unless the Mead Institute shows a substantial burden. Okay, so you're not articulating what the legitimate in-state issue is. You're saying you don't need to worry about that. Could you first articulate what the legitimate in-state issue is before you get to why I don't have to worry about it? Sure, yes. To the extent that we're talking about the extraterritoriality claim, this Court has repeatedly rejected this argument in similar cases. Just last year in Rocky Mountain II, this Court, citing A. LaGour and Walsh, reiterated that states may seek to influence which products are sold in-state,  and here California is permitted to promote animal welfare within the state by preventing the state's complicity in practices that have been deemed cruel to animals. Okay, so you are saying it's an animal welfare interest, as Judge Benchivengo was mentioning, that the people of California can decide that animals that are not contained in a cruel manner are the only ones that can be sold in California. So can you then address opposing... If that's legitimate in-state interest, am I right? That's what you're saying. Can you address opposing counsel's point that that goes too far and you could prevent the sale of products that were not made by individuals who were making the California minimum wage? Yes. And so again, just to return back to the point I was first making, this is not, as this Court indicated in Pharmaceutical Research v. County of Alameda, it cautioned against conflating this PIKE substantial burden component with the extraterritoriality test. But to go to the hypothetical that was posed, the touchstone of the extraterritoriality analysis is whether the challenge law controls fully out-of-state conduct. And so if we have a hypothetical law, whether it's the minimum wage law posed or some other law, that's what we're looking at. If it's only controlling in-state sales, then that law would be constitutional... So in other words, the law that opposing counsel proposed, which said no products can be sold in California unless the employees involved in manufacturing that are making a California minimum wage would be lawful, would be constitutional in your view. Is that correct? On extraterritoriality grounds... No, no, just tell me whether that would be constitutional, that there's no negative commerce clause that would prevent that sort of law from being enacted and enforced in California. Is that your position? If it is that narrow, that it's focused on in-state sales only, and it does not have a protectionist purpose, then that law may be constitutional. Of course, certain laws obviously have a protectionist purpose. They're meant to benefit in-state... I mean, obviously it would have a protectionist effect. I don't think... You're not saying it has to have a protectionist purpose if it has a protectionist effect, are you? No. So there are a number of cases in which this court has dealt with laws that have struck down laws with a protectionist purpose and effect. The Supreme Court, the cases that are cited by the Meat Institute, for example, Baucus, Baldwin, Westland Creamery, those were all cases in which the law effectively taxed or did tax out-of-state interests for the purpose of benefiting in-state interests. But there are also laws that the Supreme Court has upheld, like Exxon, for example. That law uniquely burdened certain out-of-state producers, specifically petroleum refiners, and yet the Supreme Court held that the law was not discriminatory because, like this law, it treated all of those petroleum refiners the same. It treated all entities the same. Minnesota v. Cloverleaf Creamery is another example of a Supreme Court law in which there the challenge law prohibited all milk retailers from selling their products in plastic, non-returnable milk containers. And the Meat Institute has not addressed this law, which was upheld by the Supreme Court. This law, Proposition 12, regulates even-handedly. It applies the same standard to all products, whether they're produced in-state or out-of-state. And so it is not like those other laws in which there was a protectionist purpose or effect. And the circuit has recognized that in cases like Baylor-Roar. Two decades earlier, it recognized that in Pacific Northwest Venison producers v. Smich, that even a complete ban on certain items is not discriminatory as long as it's not fueled by economic protectionism and does not benefit in-state interests to the exclusion of out-of-state interests. And all the evidence in the case is... Could I also ask you about the effect of the regulations which the district are focused on? Do you agree with opposing counsel's characterization that it may fill in some of the gaps, but the statute is currently effective as of whenever, I guess the January 1st, after it was enacted or passed? According to my notes, the conditions of confinement didn't go into effect until December 31st of 2019 and December 31st of 2021. So it was not like the next day you couldn't ship meat into California. So whatever it says in the statute, as opposed to the regulations having an independent changing of the effective date. Is that correct? I think the point... There are two different components of the statute, the turnaround standard and then the regulations that Judge Benchavango just mentioned, the components that Judge Benchavango mentioned. And so the regulations aren't going to change the outcome of this case. This case is strictly on the law. The turnaround standard is in effect. There are effective dates for other components. And so it's not something that the Meat Institute is challenged because those regulations are not in effect. Thank you. I was just confused. Let me ask you this. It's not as if different places don't have some standards that they have to comply with. So if we want a national standard, that would have to be something Congress would do, correct? Correct. So why should California be able to set the standard for everyone in the whole United States because it satisfies California's moral compass? And so no one else can sell in California if you don't buy into that. Two points, and this goes to the important principle at stake here, which is that in a Federalist system, each state must be permitted to exercise its sovereign powers to regulate the products within its market. And so two points. One is the Meat Institute has not made any allegations that this is one of the rare cases, like NCA v. Miller, in which there is a unique need for national uniformity in the market. Instead, this case, like the Foie Gras case, addresses a law that does not impose the sole method the plaintiff must follow. And this Court has repeatedly rejected the argument made here. In Rocky Mountain One, for example, this Court makes clear that let's just say it didn't cost more money to treat animals the way California Prop 12 wants animals to be treated. So would your case be a better case if it wasn't? I mean, essentially, it costs people more money to comply in California, so other people can do it for less. And if that weren't there, wouldn't your case be better? I mean, here, there is an equalizing of the playing field here because Californians then aren't able to compete in their own market. No, that doesn't make a difference because the Supreme Court rejected that argument in Exxon. And this Court has reaffirmed the principle in the optometrists and fuel standard cases. The same analysis applies here. And if we go to the substantial burden portion of the Pike analysis, the same basic idea applies in the optometrists and fuel standard cases. There's no constitutional guarantee to a preferred, more profitable method of operating in a retail market. Okay. I want to find out if either of my colleagues have any questions because you're into the five minutes, which I'm not going to take away from. But if they have questions, I want to be able to ask them of you. Do you have any questions that you would like to ask Mr. Wise? No. I'm fine. Thank you. Okay. Then we will give – all right. So that will conclude. So you're saying affirm, right? That's it. And then we'll go to Mr. Wagman and we'll set the time at five minutes. Thank you, Your Honors. May it please the Court. Bruce Wagman for the interveners. In my time, I'd like to address two points, if possible. I'd like to address what's been raised already by Judge Benchavango, that the undeniable purpose of Proposition 12 is to keep products of cruelty off of California's shelves and out of the California market. The people of California have determined that certain confinement methods constitute cruelty to animals, and based on that sentiment, adopted Proposition 12. It is a hallmark of our federalism that the citizens of each state get to make those decisions. Do you agree with your co-counsel that a similar analysis would apply if California said no sales of products in California, if the products are manufactured in companies where the employees don't make the California minimum wage, that that would be constitutionally acceptable?  Because it goes directly to, number one, potentially a national market in a wage setting, and also to an economic issue. If you notice in the briefs, almost every case that the plaintiffs raise goes to an economic issue, an economic outsourcing, putting some prejudice on out-of-state interest for economics. Not one of their cases represents a case in which welfare issues, a law based on welfare, was actually struck down in the Commerce Clause. So is a minimum wage, in your view, not a welfare issue for the employees? It would depend on what the state of California argued it was benefiting from by setting a minimum wage standard. So the people in California don't want to have products in their stores that are made by people making less than what they consider a living wage. It would be cruel. Would that be okay? In that case, Your Honor, if that was the purpose that was stated in the statute, I think we'd be closer to our case. Again, we'd be affecting a national market with an economic interest. Whereas here, we're talking about something under the police powers and health and safety, which has always been reserved to the states and doesn't touch at all on economics in other states. But yes, Your Honor. Your co-counsel was talking about humane treatment of animals, obviously out of state, and not about health and safety within the state. So when you mention health and safety, what are you referring to? Your Honor, I was referring, number one, to the general police powers. But also, as everybody agrees, Proposition 12 includes a health and safety component. And even plaintiff's expert, Dr. Belk, who's been mentioned in this proceeding by plaintiff's counsel, did recognize, and this is in the state's briefs, that there is some dispute and some discussion about confinement standards leading to safety problems. But, Your Honor, as Mr. Wise said, we can rest on the welfare standards. Case after case have recognized the right of the states to use this standard and to use this purpose. Again, the Harris case, the Chinatown neighborhood cases, other cases in other states, the Crescenze case out of New York, out of the Fifth and Seventh Circuit, the horse meat cases. Additionally, as we know, California has utilized that purpose in order to ban dog and cat meat, horse meat, the sale of exotic animal parts. So that purpose is more than enough, Your Honor. I'd also like to shift to something that, in the context of this appeal, is so important, and that is the declaration of Dr. Ekesler, that's at Excerpt of Record 60-84, and that was submitted in response and in opposition to the preliminary injunction motion. That declaration details the extremely questionable, if not incorrect conclusions and statements of plaintiff's declarants. In short, Dr. Ekesler states that plaintiff's recitation of harms, quote, fails to factor in one half of rudimentary economic analysis, the benefits that will result from this regulation, unquote. So to Judge Callahan's point earlier, it is not clear how much more this is going to cost anybody. That is clearly unestablished, and especially with the Ekesler declaration, we have demonstrated that that is something that Judge Snyder had every right, based on the abuse of discretion standard that the Court reviews here, to decide in our favor. I guess I see this to some extent, since we're not talking about, the health and safety kind of went out. I see it as, and I'm a native Californian, I would say California has a different moral compass than a lot of other places. And I'm just saying that as, I'm not saying it's good, it's bad, or whatever. But what would restrain California from imposing its moral compass, you know, what does constrain California from imposing all of its moral compass values on people outside the state? What would? Your Honor, let's be clear, and I know my time is up, but I'd like to answer your question. Yes, let's be clear. California is not imposing its standards on anybody. There are no prohibitions on out-of-state conduct under Proposition 12. There are no requirements for any under Proposition 12. Out-of-state producers have the choice to convert some or all of their activities, or not. Again, the declaration shows that that may actually be a benefit to them, if you look at that. They may actually do better, and they now have a competitive advantage, if you think about it, because they can sell to any market, whereas California out-of-staters cannot. I should also mention that at least a dozen states have adopted standards similar to California. This is the current movement in America, and many, many corporations have done exactly the same thing, the biggest corporations. And even plaintiffs' members have declared their dedication to humane requirements. The fact that plaintiffs don't like the specific requirements that California has, case after case, has demonstrated, they don't get to make that choice. Okay, do either of my colleagues have any additional questions? Mr. Wex? No. All right, thank you for your comments, and we'll go back to Talent, and I believe that you have three minutes. Thank you, Your Honor. Just a couple of points. First, on the question of— Wait a second. It's not right. We have to get the clock right here. There we go. Thank you, Your Honor. The question of whether California gives people a choice, well, the controlling standard is set forth in a case called Carbone. In Carbone, the court said that a state may not restrict imports or exports in order to control conduct in other states. That's what's going on here. There are restricting imports in an effort to control conduct in other states, and there's no way around it. Rocky Mountain 1 acknowledged that Carbone standard applied outside of affirmation statutes and outside of price limitations. In that case, the court said that the fuel standard there didn't control. It provided incentives, so it didn't ban any fuels from the California market but gave incentives based upon the way the fuels were made. This case is much different. In this case, California says you are banned from sending veal or pork, wholesome veal or pork, into the state unless you follow precisely the way we say that you should make it. That's an extraterritorial statute. It's a statute that discriminates by taking away an advantage, and it crushes this flow of interstate commerce. For all those reasons, we think— Okay. Let's just say hypothetically that the law said, well, you can sell, but then you have to put on there where it's from. Would then you be making a First Amendment claim? Your Honor, I think the issue in that case, there's a federal labeling law, and so the state can't change the labels. But what individuals could do is they could provide— individual companies can market themselves by putting forth a label that indicated how a product was raised. As long as that wasn't misleading, that would be fine with federal law. But as a general matter, labeling would be okay. Labeling would be okay under the Commerce Clause. But here, what they've done is it's really the flip side of what the court struck down in Daniel Sharpsmart. In Daniel Sharpsmart, the court said just because— what California tried to do was try to regulate exports. It said you can't export medical waste unless you dispose of it out of state in the way we dictate. And the court said you can't do that because relying upon carbone, the court said that you are putting restrictions on exports. This case is one in which those restrictions are being put upon imports. The Ninth Circuit has acknowledged that that's the governing standard in Rocky Mountain One, and it just wasn't satisfied there. But here it's quite clear. The only choice we have is you either comply completely or you're out of the market. The one last thing I'd say is the court— And why is that so bad? I mean, that's an economic choice you have to make. If this is a legitimate local public interest to protect animals from being treated cruelly, and the people of California have said we want the products we buy to be ethically sourced, to be ethically treated before they come to market here, your client's decision is they either then sell in California and comply, or they don't. And have they demonstrated that it's an excessive burden on them? And was the district court finding that it wasn't so clearly erroneous that we should say she abused her discretion? Well, Your Honor, the problem with each individual state deciding what production standards should apply for products that are coming into the state is that it's entirely inconsistent with a national unitary market, which is what the Commerce Clause is designed to ensure. As Justice Alito explained in Tennessee wineries last year, that's the whole purpose that the Constitution was adopted, just to prevent these individual markets. All right. Any additional questions from either of my colleagues? No. All right, your time's expired. I want to thank all counsel for your arguments, and you're all very well prepared, and we appreciate that. And this case will stand submitted, and this court is now in recess for the week. And so if the judges stand by, then we'll conference. All right, thank you, counsel. Thank you, Your Honor. Thank you. Have a good weekend.
judges: Callahan, Ikuta, Bencivengo